The United States Court of Appeals for the Federal Archive is now open in session. I will now say the United States' Honorable Court. Please be seated. Good morning. The first case on the docket is 2008-1462. And I guess there's possibly a little confusion here because of very recently filed documents with this court, which we saw for the first time this morning. So I was wondering if it would be helpful to the court if the parties that are involved in this recent submission, so it would be Mr. Wright and Mr. Sherr, if they're here, it would be helpful to the court if they could approach and perhaps respond to our questions with regard to what the status of the particular case is and so forth. So, Mr. Sherr? Yes, Your Honor. And Mr. Wright? Yes, Your Honor. Okay. We received this document. Let me be clear. We've got two different cases pending. So whatever we got is exclusively for 1474 and 1477 with respect to that appeal and not with respect to the other appeal. That's correct. Okay, well done. Now, could you tell us, this is framed as a joint notice of dismissal and withdrawal of appeals. Can you tell us, and it also refers to the fact that there's an Appendix A, which we have not received, at least we here have not received. I'm not sure if it's in our clerk's office or not, but as you know, this just happened in the past hour. So could you tell us what is happening and what you are seeking from this court and what the status of the appeal is? Well, Your Honor, we have filed in the district court a joint, a stipulated dismissal there, and I believe that was Appendix A in what was filed with the clerk's office yesterday afternoon at 457. Okay. And I apologize. What happened is that the TORUS offered on Tuesday to withdraw its entire case against Hyundai, and then it took us until yesterday afternoon. No, and I appreciate it. I mean, that's the world we live in, and so I understand. And if the case can be resolved appropriately, then that's fine. But the court, the district court has therefore not acted. Has the district court acted on the motion, as I said, that I haven't seen? It has not. It has not. It has not yet acted on the stipulated dismissal. Okay. What is your view under Rule 42 or otherwise as to the process, therefore, that has to follow? She first has to grant the motion. And then what is the status of the appeal, and what is your authority to get the appeal withdrawn? I mean, this, you're not moving, this is not a motion to dismiss the appeal in front of us. This says it's a joint notice of dismissal and withdrawal appeals. So you are notifying us that you are withdrawing the appeal? Yes. Is that what it is? Okay. Well, do you – again, I'm going to – We need to do that. Because this is, you know, just happened, but it seems to me just printing out Rule 42 for dismissal appeals, it all provides for the circuit court dismissing it, may dismiss, or it alternately provides for an appeal, may be dismissed on the appellant's motion, on the terms agreed to by the parties. My own personal experience, as I recall it right now, is that parties have typically moved to dismiss the appeal. And we have nothing before us other than a joint notice of dismissal. Well, if a motion is the appropriate vehicle, would it be appropriate for us to make that joint motion right now? Well, what I would prefer, and I'll consult with my colleagues in a moment, is that I think since this has all happened, I don't want to lead you astray. So I think perhaps the most prudent course – and also, I mean, I don't know if that motion would have to proceed, the grant of the motion, or you would want our granting a motion, if that's what you decide to file, to proceed the district courts acting on the motion of dismissal. So it's something you ought to think about. I mean, you've moved to dismiss. She hasn't granted your motion. So I don't know – I mean, right now – it may be, though, that she doesn't even have the case, right? Because the case is here on appeal. So I'm not sure she can grant the motion before we – in any event, I think it's – I don't want to tell you what to do because I'm not sure of the appropriate course. I haven't consulted with our clerk's office. What I think would possibly be the most prudent way to proceed right at this moment, not to hold everyone else up, is at least if you would agree the appeal, as far as I can tell, is still before us. If you want to agree to waive oral argument for this morning's purposes, that, I think, the panel would be prepared to grant. And then we can all, after this proceeding is over, step back, and you can perhaps consult with our clerk's office, if appropriate, and find out the best way to resolve this. And if it's not resolved, we – and if necessary, we've waived argument, but we could – you know, the case is still before us, and we could decide it on the briefs. So let me just see if my colleagues would be amenable. I agree, but I also have a question I'd like to ask. So if the – let's say that the motion was to be granted and the dismissal takes effect, does that mean that Mercedes is the only defendant left in this appeal? Well, in the two appeals that we're talking about right now, which are, I think, 1474 and 1477, the only defendant in those two appeals is Hyundai. We have two different case numbers because Hyundai also has a cross appeal. So Hyundai is the only defendant in those two appeals, but, of course, those appeals were consolidated with appeals involving Mercedes and Chrysler. So Mercedes and Chrysler would still be in the case. So as I understand, I think the only – thank you, Chief – the only person who would be not arguing would be you, Mr. – Scherr. Mr. Scherr. You're the only person who would not be arguing, correct? Mr. Wright would still be arguing with respect to the appeal against Mercedes and Daimler Chrysler. Yes. 1462. And I am prepared to waive oral argument. As is yours. Okay. So we'll agree to waive oral argument and then we'll proceed either to act and dismissal of the case or we still have the case before us so we could decide on the breach. I thank you very much for your attention. Thank you. So we will still – everyone anticipates that that means that the other appeal is still pending before us, the 1462, 63, 64, and 65, and that we will proceed, therefore, with argument with regard to that appeal. So why don't we proceed? Since this is an occasion of a split argument, even in the absence of Allende, it would be helpful, I think, to the panel if when you get up, you tell us which issues you're going to be dealing with versus your co-counsel. Good morning, Your Honors. I plan to address two issues in my remarks, sanctions and breach of contract. I'll start with sanctions. The district court abused its discretion by sanctioning Orion and Mr. Stangenberg without providing specific notice of the conduct that could be sanctionable and without providing an opportunity to be heard in full before sanctions were imposed. Those are the requirements set forth on the Seventh Circuit in the Johnson v. Cherry case. So with regard to the final point on in full, I mean, you got to argue it. I mean, there was clearly an opportunity to discuss and debate and to put all your arguments forth, but is it your position that what happened? Is there an additional briefing or briefing on this matter, and that's what you call the failure to be heard? That's a very good question. Let's describe what the district court did. The district court held a hearing in which Mr. Anderson was called to testify. In open court, both parties were permitted to examine Mr. Anderson, but then the district court went in camera and excluded Orion and Mr. Stangenberg's counsel from the proceedings, heard further testimony from Mr. Anderson, and I think most importantly reviewed an unredacted copy of the letter that Mr. Anderson had sent to Mr. Butler. And this, after all, is the key exhibit in this supposed witness intimidation. This is the letter from Mr. Anderson to Mr. Butler that was the centerpiece. Orion's counsel and Mr. Stangenberg's counsel never saw an unredacted copy of that letter at the time of the hearing. Still today, I've never seen an unredacted copy of that. That was the first thing that the district court asked for. Are you arguing that the in-camera meeting was unauthorized or improper? A court always has the right to go in camera, but where the abuse of discretion occurred, Your Honor, was in then not entering in order to show cause, as the Seventh Circuit in the Larson case says, the proper procedure, and give Mr. Stangenberg and Orion a full chance to respond to the allegations that were made. Instead, she suddenly imposed sanctions when she came out of the in-camera proceeding, to which the attorneys representing Orion and Mr. Stangenberg at the time had been excluded. She came out of this hearing in camera, clearly angered, and stated that, in her view, Mr. Stangenberg was responsible for what she viewed was a serious attempt to intimidate a witness. Did you have a chance to argue the appropriate sanction? Once you knew that the judge was going to issue a sanction, did you have the opportunity to argue what was the appropriate sanction? Yes, and the attorneys at that time in open court did argue that. But the law is clear in the Seventh Circuit, Johnson v. Cherry, that you need to be afforded a full opportunity to argue against the imposition of sanctions before they are imposed. And that was not given, because the district court came out of that in-camera hearing and said there will be sanctions, and then immediately shifted the discussion, as Your Honor alluded to, to what the sanctions should be. And my clients, Orion and Mr. Stangenberg, did file a motion for reconsideration on that issue, but that's after the fact. And the law in the Seventh Circuit, the controlling precedent, Johnson v. Cherry, makes it very clear that you have to have a full opportunity to be heard before sanctions are imposed. And in this case, our client didn't have, at the time, our client still does not have a full copy of the letter that was the basis of the sanction, did not have an opportunity to even hear, let alone cross-examine, Mr. Anderson during his extensive in-camera testimony. But you did have an opportunity to cross-examine, Mr. Anderson. Before. Right. But the sanctions were imposed immediately after coming out of an in-camera hearing. But given what the district court said about the basis for the sanctions, wasn't that information that you had access to? What she wrote, arguing what she relied on in awarding sanctions, did not involve the matters necessarily that were in-camera. You all knew about that testimony. We still do not know the full extent of the testimony that went out in-camera. But she described what she was relying on in terms of her imposing sanctions, and that you knew about, correct? We had her summary. We had no opportunity to cross-examine Mr. Anderson. We had no opportunity to call Mr. Anderson. But that's not my question. I mean, there are different parts of this. I'm talking about what you knew about, and you're distinguishing between in-camera and not in-camera. And I'm suggesting, and you can say I'm wrong, that the conduct upon which she relied in awarding the sanctions was, in fact, conduct that was disclosed and discussed in the open hearing, and you had an opportunity to cross-examine, et cetera, right? I disagree with that, because the conduct was sending the letter. And we still, to this day, do not know what was in that letter, because all we have is a redacted copy. What do you think you can do over it? I mean, if we agreed with what you said, it wouldn't require any sanctions. Sanctions should be reversed. The case should, if it is to be remanded, it should be sent to a different judge in accordance with Seventh Circuit rules, and the district court can consider whether the issue should be taken up again. But at a minimum, at that point, we should get a full unredacted copy of the letter or the sanctions issue should go away. Now, you said that's one issue. Was there another issue? The second one is the breach of contract, Your Honor. Of course, the sanction that was imposed was that the jury got to hear only half of the story. But even before that, the district court had committed a legal error by extending the warranty and rep provisions of the settlement agreement that had been entered into between O'Ryan and Chrysler to expand beyond the patents that were the subject of the litigation that was the subject of the settlement. Review of contract interpretation is a legal matter. De novo review by this court, and the contract is clear. It was entirely limited from start to finish to the O'Ryan patents, which were defined in Exhibit A to the agreement, Appendix A to the agreement. The license was limited to that. The district court so far, the release was limited to that, and the warranty provisions were all limited to that. There were three clauses in the warranty. The first one was limited to a representation that O'Ryan owned the O'Ryan patents. Second was that the O'Ryan patents were valid and enforceable. The third clause was that they had not transferred  The litigation was limited to the O'Ryan patents. The entire agreement was limited to the O'Ryan patents, and any question on this was eliminated by the additional clause in the warranty and representation section of the agreement, and this is Clause 8.1B4, and this is at Appendix Site 92-84, where the agreement said, that nothing contained in this agreement shall be construed as conferring by implication, estoppel, or otherwise upon either party any right or license under other patents, except for the rights and licenses expressly granted hereunder. It could not have been clearer. Had Chrysler wanted rights, a warranty, a representation, a license, whatever, under the 658 patent, they would have explicitly negotiated that and put it in the agreement. Had they wanted freedom to operate their websites, they would have put that explicitly in the agreement. When Warren first brought suit, it owed the patent that it asserted in Wisconsin, correct? That's correct. For five days, and then transferred it, and the evidence is clear. As Chrysler has admitted, they were aware of that transfer at the time that they were negotiating this agreement. They could not have been under any misapprehension that vague language that they point to now and that the district court improperly relied upon could have given them rights in the 658 patent. A patent they knew no longer was in the hands of Orion, the party that they were negotiating with. Chrysler is a sophisticated company, and they know how to protect themselves in an agreement. They got exactly what they bargained for in this agreement, and it did not include any representations, any warranties with respect to the 658 patent because that patent was not involved in the litigation. It was not on the list of patent rights that they explicitly received in the settlement agreement. So it's our position that that was legal error. That issue never should have gone to the jury, and certainly shouldn't have gone to the jury listening to all kinds of one-sided parole evidence from Chrysler about their supposed intentions when they negotiated the agreement without full evidence, and that should be reversed in our view. Okay. Thank you. I will now recede to Mr. Wright for his rebuttal, and Mr. Wright. Good morning. John Wright on behalf of the Appellant Taurus. I'll be primarily addressing the sanctions that were levied against Taurus under Section 285. May it please the Court, there are two independent bases for why the District Court's Section 285 exceptional case finding against Taurus should be reversed. First, in finding that the patent suit was vexatiously litigated, the District Court improperly punished the patent owner Taurus for the conduct of the third-party breach of contract defendants, Orion and Mr. Spangenberg, despite not having pierced Taurus' corporate bail, because Orion and Mr. Spangenberg were not parties to the patent case. Counselor, could you address the sanctions of attorney's fees and the application of Texas law to those sanctions? Well, there would be no application of Texas law to the attorney's fees that were awarded to Taurus under Section 285, because that case was brought in Wisconsin by Taurus against the defendants in that case. So it's just under Section 285 that those attorney's fees were awarded. And because Orion and Mr. Spangenberg were not parties to the patent case, and because Taurus' corporate form was upheld, it was clear error for the District Court to find that the case was vexatiously litigated based on conduct of Orion and Mr. Spangenberg. The second reason why the Section 285 findings can be reversed is that the District Court did not come close to meeting the exacting standard that Section 285 requires for finding a patent case exceptional. None of the cases that the District Court relied upon support its findings in that regard. And in fact, two of the primary cases that it relied on were subsequently overturned by this Court on appeal. And the District Court simply did not show, by clear and convincing evidence, that Taurus' patent infringement suit on the merits was objectively baseless. And second, the Court didn't make any findings with respect to whether Taurus later subjectively formed a good faith belief in pursuing its infringement contentions, even post-Markman. And on either of those two bases, the Section 285 damages for finding the case exceptional can be reversed. One question at 195 of the Joint Appendix. As I understand it, the District Court awarded against Taurus $1,644,906, right? Yes, sir. Now, is that for the conduct simply with respect to the 285? Well... What the District Court saw as a 285 violation? That's what the District Court said, but it's not clear how she arrived at that $1.6 million number. At A188 in the appendix, the District Court kind of proportioned the damages between the patent infringement case and the warranty case and said that the patent infringement case damages were $2,487,000, and that for the breach of warranty claim it was on the order of $1.3 million. Now, the grand total there is the $3.8 million. Now, at A212, where the District Court actually awarded the damages, she awarded against Taurus and Orion jointly and separately the $1.6 million number. I don't know where she got that number. Against Orion, it was actually broken out to almost $2.2 million, but again, those two numbers, the $1.6 million and the $2.1 million, add up to the total from the apportionment at A188, but it's not clear to us how she arrived at the numbers when she actually awarded the damages. So you're not clear as to whether the $1.6 million is simply for what she views as a 285 case? I think the $1.6 is for what she viewed as the 285 case, but I don't know how she arrived at that number. Okay. Now, just one other question. I think you are correct that we reversed in Metabolite and also, I guess, Dupuis Fine, but weren't the facts of those cases different from this one? In Dupuis Fine, the facts were different. I think in the Medtronic case, the facts were much closer. They were different in the sense that that case had already gone through appeal and then it went back to the district court on sanctions, but the district court there relied, or sorry, this court, in overturning that case, for instance, relied on the fact that Medtronic had returned to its experts post-Markman, had gone through and done a supplemental infringement report in its motions opposing the summary judgment, and that's precisely what Torres did here post-Markman. It returned to its experts. It returned to the source code. It got a supplemental infringement report and had a good basis for proceeding, and importantly, the judge's decision did not have any, in the district court, didn't break out that subjective component of the two-part test for finding a case exceptional under Section 285. I'm mindful of eating into the rebuttal time. I'm so sorry. No, that's fine. We'll retain the rebuttal time and since you've gone over, at least with respect to the issues that you've discussed, if the other side needs more time, you've gone over a few minutes, so we'll award that to them. So, Mr. Stockwell? Good morning, Your Honor. Mitchell Stockwell. I'm representing Mercedes Benz. Okay, and are you covering, how are you splitting the issues? Yes, Your Honor. So, I will be addressing any questions about jurisdictional issues as well as the sanction issue and the patent issues. This, Woodworth is representing Chrysler. We'll be focusing on the breach of contract and the expert fee issue under Texas law. Okay. So, I guess you get a little, a couple more minutes extra in light of the questioning for your friend on the other side. Thank you, Your Honor. So, I'll start with the sanctions issue and I want to back up and make sure the court understands the timing of the sanctions issue. The Thursday before trial, Mr. Spangenberg called Mr. Anderson and suggested to Mr. Anderson that he believed Butler was going to perjure himself. Mr. Anderson was a former Chrysler lawyer and a current lawyer for one of Mr. Spangenberg's companies working out of Spangenberg's office. Mr. Anderson called Mr. Spangenberg's counsel of record in the Orion case, the Taurus case, pulled a summary judgment order, wrote a letter to Mr. Butler, prepared the letter, called Mr. Butler Friday afternoon before trial, the week before trial began, sent the letter. Over the weekend, he prepared a declaration suggesting the possibility of perjury and tendered that. Now, all of this happened right after on the Thursday afternoon we'd had a status call with the court and an offer of proof and we had indicated to the court what our offer of proof was and that we had finally confirmed that Mr. Butler, who was a third-party witness, was actually going to appear at trial because that was uncertain. He had to voluntarily appear if he owned a subpoena power. That's when this whole chain of events was set into motion. On Monday morning, we filed our motion requesting a hearing laying out the Seventh Circuit authority that said, when you're confronted with potential witness tampering, the proper course for the district court is to convene an evidentiary hearing and in the motion, we specifically said that this is an extremely serious misconduct, cited the cases on that, and suggested that the sanctions could range from dismissal to defense suppression to adverse instructions. On Tuesday, the hearing was conveyed. The court ordered Mr. Anderson to show up as well as counsel for Ryan and Torres and Mr. Spangenberg was also in the courtroom as the record reflects. Now, with respect to the claim that Ryan was somehow prejudiced by not being able to appear in camera, I'd like to direct the court to the record on that. So, at A... 10-126... Do you want to tell us what the volume is? Yes, I apologize, Ron. It's volume four. Okay. What's the page number again? 10-126. The court was asking how to persuade and I was explaining we're willing and able to call witnesses, this is at line 13, and I explained we had the issue that dealt with witness tampering, which ought to be dealt with in open court, and then we ought to have the issues relating to Mr. Anderson's employment at Chrysler dealt with in camera. You turn over to the next page, the court asked a few questions about what I meant by open court and that was everybody was there, all of Ryan's lawyers, Mr. Spangenberg was there, that was the examination of Anderson in open court, and the only in-camera exclusion was for the testimony from Mr. Anderson about his work at Chrysler. Mr. Camelli, who was Ryan and Spangenberg's counsel, said we agree, we'd love to see the truth come out, however we're best able to accomplish that, we certainly would be supportive of that. So then we had the examination of Mr. Anderson in open court, Mr. Camelli cross-examined him. We got to the end of his cross-examination. Counsel, prior to, so going back to Mr. Camelli's statement, was there any objection to having an in-camera hearing at that point? Not, no, Your Honor, and in fact, when we got to the end of the examination of Mr. Anderson in open court, Mr. Camelli had asked a few questions that got into the substance of Anderson's work at Chrysler, those were objected to on privilege grounds. So then he said, at A10-1890, that's the page after he'd asked the questions that were objected to on privilege grounds, as the court was going into the in-camera hearing, a couple things, Your Honor. I think this is a truth-finding mission. These questions have to be asked. I would have no objection to you conducting an examination. I think I would like to share with you some areas that you should probe, although I think you're well-versed with what are the critical areas here. He proceeded to show those. That is A10-890, sorry, A10-1890. So, the other objection that has been lodged is that Spangenberg, or in Orion, did not have a chance to see the full copy of the letter. Your Honors, Mr. Anderson was wearing two hats. He was Spangenberg's lawyer, and he was a former Chrysler lawyer. He wrote the letter. He was Spangenberg's agent. Spangenberg was the person that caught him, aimed him at Mr. Butler, and had him fire off that letter on Mr. Spangenberg's computer, in Mr. Spangenberg's office. The notion that their due process rights were violated under these circumstances just does not hold water. I think the other issue we have here is sort of the selection of the sanction. We argued that the sanction of suppressing the reliance defense was simply insufficient. And we put into our briefs the Texas case law that said if a warranty provision is integrated into the contract, in writing, there is no reliance element. Now, I would note that when Orion replied, they acknowledged that that was a proper reading of Texas law, and shifted theories and said, well, the real harm here was not the suppression of the reliance defense, it was the suppression of their ability to tell their side of the story. We would have been objecting to any evidence concerning reliance on the grounds that it was not an element under Texas contract law for us to prove. The judge could have excluded it as more prejudicial than probative. Here, the sanction simply did that. In other words, the choice of sanction was actually relatively mild despite the egregiousness of the conduct. I want to move on to addressing Taurus's exceptional case point. In that regard, Mr. Staubl, and maybe you were going to do that anyway, but I just wanted to make sure it's covered, at least for my interest. You heard in my colloquy with Mr. Wright that he pointed to the 1,000,006 figure and said that, I think I have it correctly, he said that it was his understanding that that was for the 285 issue exceptional case, but that he wasn't clear exactly as to how the judge arrived at that figure. Do you agree with him that that 1,000,006 figure is solely for the exceptional case? Yes, that is in fact how we presented the evidence to the court in terms of what was attributable to 35 U.S.C. Section 2. So you adhere in agreement on that? Correct. Not on the merits, but that's what that's for? Correct, Your Honor. And just to be clear, the way we've always understood her order is Taurus is liable for that portion, Orion would be liable for the whole portion, but if Taurus pays the 1.6, Orion would only pay the difference between 1.6 and 3.8. So it's not, in other words, she was not trying to double count there. And one of the... But arguably all Taurus is on the hook for is the 1,000,006. Correct, Your Honor. That is our understanding of the judgment. And the reason there is a slight difference between the Taurus patent calculation and the Orion patent calculation has in part to do with Texas law and the breach of contract claim. Part of the patent defense damages that Orion owed were expert fees, which under this court's authority require more than just an exceptional case. We were already getting that from Orion, so we did not try to prove up those facts with respect to Taurus. Now on the claim that there was never a finding on the objective prong or the subjective prong. So let me start with the subjective prong. There was testimony at trial by Mr. Spangenberg. The question that was asked was... The question was asked, what is the difference between... What did the Taurus litigation relate to? And this is at A9887 through A8. And Mr. Spangenberg testified that the 658 patent related to data management happening that was occurring behind the website, so there is a server side and a user side. I think the 658 patent goes to the server side of the equation, not the user side of the equation. The district court cited this because it was completely contradictory to the entire theory in which the case had been brought. The theory under which the case had been brought was that the user side, the web server, infringes the patent. Mr. Spangenberg's theory at trial in trying to say the 658 patent case was not related to the Texas litigation was, oh no, that's the back side. That only has to do with the data managers, the users who have control over the database and can actually change the rules, put the rules in, edit the rules. That was completely contradictory to the entire theory of the case. It showed subjectively that the case was brought in bad faith. And it was also correct. The judge's construction of those terms were correct. The key claim construction dispute was not over whether the user had to put in a set of rules. It was who had to put in a set of rules. Forrest itself construed relationship information to relate to the rules that connected these data elements. The parties were disputing whether user defined meant the user had to put the information in or the computer had to put the information in. The court correctly found that the user had to put the information in. That was in the claim language. That's what the specification taught. And that's what the prosecution history taught. And we contend the prosecution history disclaimed any use of just the software and the computer to create the rules. The judge ruled on that and found in our favor on the claim construction. And while counsel is correct that the court later reversed the diffuse fine in the brain lab cases, the principles in those decisions, the court still reaffirmed the principle that if a litigant proceeds after an unfavorable claim construction ruling, that is grounds for an exceptional case ruling. That's exactly what happened here. It could not have been clear from the court's construction that, in fact, web surfers were not users. They were not creating or editing rules. I have really no other points to address on those. But I do want to point out one issue on the jurisdictional front. Well, you want to be brief because you're eating into your colleagues' time. Well, I apologize, Your Honor. Just briefly, there is a distinction in Texas law between bail piercing for substantive purposes and bail piercing for jurisdictional purposes. The Texas Supreme Court has found those standards are different. And I would refer the court to recent cases, the Grand Area Fraternal Order of Eagles v. Haygood, 2013, Westlaw, 163981. Were these cases cited in your... They were not. This is a January 13, 2013 case. Where the court notes... I'll say it again. Sorry, Your Honor. 2013, Westlaw, 163981, where the court notes that jurisdictional bail piercing is distinct from substantive bail piercing. So for jurisdictional bail piercing, you simply have to show the entities are fused as one. For substantive bail piercing, the Texas courts and the statute have different requirements. Would you say that the jurisdictional bar is lower than that for liability? Absolutely. And that's what the Texas cases hold. And, in fact, Orion's reply brief cited a Shook v. Walden case that came about after Judge Graff's opinion and refers to it. And, in that case, they actually agreed with Orion's or Judge Graff's reading of the Texas statute, agreed with her analysis, find that equitable principles govern whether to actually pierce the bail. They conclude they're not going to do that in that case because they would have imposed the corporation's contractual liability on the individual shareholder. That's not what was happening here. Here, the jurisdictional bail piercing simply attributed the individual contacts of Spangenberg and Torres to Orion for purposes of holding Orion to its agreement and avoiding the injustice of forcing Chrysler and Mercedes to defend patent infringement claims at the rocket docket that Torres chose in a way that they would not have been able to press their best defense, namely the settlement agreement. So, here, jurisdictional bail piercing was appropriate. All of the findings that the court made on All for Ego, none of them are challenged on clear error grounds by Orion. Why don't we hear from Ms. Woodward? Ms. Woodward, if you could just tell me, when you checked in with the clerk, you had a split time of four and two. Are you trying to deal with a cross-appeal issue? I am. We do have a cross-appeal and we had reserved two minutes of rebuttal time for that, assuming that it's brought up in reply. May it please the court, counsel for Orion made the point this morning that Chrysler is a sophisticated company and that with respect to the settlement agreement that they got exactly what they bargained for. We actually agree. The issue then is what was it that Chrysler bargained for? The undisputed evidence in this case, and this is found at ADD 13 and ADD 63 in the court's opinion, is that when Chrysler was negotiating to settle the Texas litigation with Orion, that its intent, it was bargaining for a comprehensive settlement so that it would never face the threat of lawsuit with respect to the accused website technology from Orion or any of the Stangenberg patent holding companies again. This intent is expressly reflected in the two provisions of the settlement agreement that are at issue in this appeal. It's important to understand how these provisions work together in the settlement agreement. First, there is the license provision. That's Section 3 of the agreement. There's no dispute as to the scope of the license. It defines what the license activities are and what the license patents were. But separate and apart from the license, there was the release provision in Section 2.1. And this assured Chrysler that neither Orion nor any of its related companies would bring claims with respect to licensed websites in the future. And finally, the warranty provision in 8.1 ensured Chrysler that Orion had not previously transferred any cause of action relating to this technology to a third party. With the three provisions together, Chrysler achieved what it referred to in the record as, quote, peace on the product. Turning first to the warranty, Orion represented it had not transferred a cause of action relating to the litigation. After properly interpreting this clause, the court left to the jury the only unresolved factual dispute, which was, is Taurus's claim for infringement of the 658 patent related to the Texas litigation? The jury found that it was, and that determination is supported by substantial evidence. Orion's arguments that the verdict should be set aside because Chrysler could not prove reliance, that fails for three independent reasons. Number one, as Mr. Stockwell just explained, reliance is not a proper defense where the warranty is integrated in the final written contract. And Orion has conceded as much in its reply brief. But even if this was a defense, number two, it was properly excluded as a result of the sanctionable conduct of Mr. Spangenberg. And number three, with respect to the knowledge that Orion relies upon, it's knowledge that the patent was transferred. But what this representation says is a cause of action has not been transferred. And there's no evidence, nor could there be, that Chrysler knew that a cause of action relating to the litigation had been transferred. Turning to damages, the district court properly ruled that neither expert testimony nor a jury trial was necessary in this case with respect to the quantification of attorney fees that would be awarded. Aside from these legal alleged errors, Orion has made no complaint with respect to the $3.83 million award. So what about the Texas cases that do seem to say that you need expert opinion when you're dealing with attorney fees? First and foremost, I think the court went through a rigorous analysis and determined that it actually shouldn't apply Texas law in this case. Rather, it needed to apply it under the Erie Doctrine of federal law because that Texas law that you're talking about is not a substantive legal policy that's trying to get at behavior outside the courtroom. Rather, it's just an evidentiary or procedural rule with respect to economies of litigation. Therefore, the court looked to the Seventh Circuit federal law where it was sitting and determined that expert testimony was not necessary on the reasonableness of the attorney's fees. Finally, Krieger cross-appeals the district... What is the authority that the district court relied on to consult Seventh Circuit law? Sure, that's just consistent with the Erie Doctrine, which is when you're sitting in a federal district... I understand that, but that's in Texas. She first consulted and distinguished Texas law, right? It's clear under Texas law that expert opinion is necessary for attorney's fees. It is, but she determined that that was not a substantive law, that that was just a law devoted to improving the accuracy of litigation. Therefore, it wasn't something that could override federal law with respect to evidence and what was necessary for that cause of action. The other thing that I would say, and she again went through this analysis, she went very thoroughly through Texas. She couldn't find an explicit statement as to why that was found, but what she did find, that what was required was actually a very low threshold, and it's a threshold that Chrysler was prepared to meet at the jury trial. Chrysler was prepared to go forward with a testimony of both in-house counsel for Chrysler as well as outside counsel with Mr. Stockwell's firm regarding the fees that were incurred and regarding whether or not those were reasonable and necessary. This kind of testimony of attorneys is exactly what the Texas courts have required. Finally, with respect to... Were the attorneys that you just spoke about, were they Texas lawyers? I don't believe that either of them were, no. When the court did, though, however, when this was presented in post-trial briefing, in Rule 54-type briefing on the attorney's fees, at that point Chrysler and Mercedes also included a declaration of Mr. Jones, who was a Texas attorney, who provided additional information to the court on Texas legal fees and the reasonableness again. Finally, with respect to the cross-appeal... Well, your time has long expired, which would include your response time on the cross-appeal, so I might suggest, unless you vigorously want to raise something, that we rest on the briefs with respect to the cross-appeal. Okay, we will do that. Thank you, Your Honor. Thank you. Nonetheless, we still ran over on the other side, so I think you gentlemen are entitled to a few more minutes. We preserved your three minutes. We'll add two to that, and it's up to you all to decide how to divide that, because the issues keep going broad. But we've got to enforce this, because we can't compensate on the other side. I understand. I understand. Thank you, Your Honor. I appreciate that accommodation. I'm going to start on the breach of contract and then go to sanctions, and then if I still have a minute, I'll let Mr. Wright discuss his point. Chrysler's counsel told us about the intent of Chrysler in negotiating the agreement and cited two spots in the record for that. That is paroling evidence. That is not the proper way to interpret a contract. On the sanctions, from what we can tell, and we do not have, still today, I do not know exactly what was in that letter or the entirety of Mr. Anderson's testimony. But he was acting sort of as the agent, right? Isn't that your problem and not the other side's, if you haven't been able to get him to disclose the letter to you? Well, if the other side, of course, would scream if he had, it is our problem because we didn't have an opportunity to defend ourselves. But taking what we do know, and it's limited information still today, what we do know at best is that Mr. Anderson was charged with witness intimidation and that charge then imputed to Mr. Stangenberg and O'Brien because he contacted a witness and insisted that the witness tell the truth. He had an obligation under the Michigan rules of professional conduct to do precisely that. And not a single case was cited by the district court or by the other side in which a party was sanctioned for contacting a witness by letter, verbally, however, and insisting that that witness tell the truth. And I think this issue is best framed by the district court itself in denying our motion. The issue is what compelled Mr. Anderson to do that? Whatever compelled him, Your Honor. I submit that contacting a witness and saying, I want to be sure you tell the truth cannot be sanctionable conduct. Yeah, but you were arguing mainly on a process violation, and that's another issue. I mean, that's a separate issue from the process. Correct. Correct. And I believe that on both scores, the sanctions have to be reversed. We did not get our full opportunity to be heard. We didn't get a chance to fully cross-examine Mr. Anderson or call Mr. Butler, the supposedly intimidated witness, or to call Mr. Spangenberg to the stand before sanctions were imposed. Because, again, you have to put yourself in the position of Orion and Spangenberg's counsel. They are sitting at a desk like this in the district court's courtroom while in camera, in chambers, testimony is going on. And they are clueless as to what's being said by Mr. Anderson. And immediately upon that in-camera hearing being concluded, the district court comes out and imposes sanctions. What do you say to your opponent's argument that there was no objection to the in-camera meeting? Well, it's not entirely accurate because on that same page, Mr. Kimeli went on and said, and we want to be sure that a transcript is made, and, of course, the assumption would be that they would get a chance to look at the transcript, to brief the issue, to have an opportunity to make that full presentation before sanctions were imposed and they were denied that opportunity. And under Seventh Circuit precedent, Johnson v. Cherry, Larson v. City of Beloit, that was an abuse of discretion. Unless there are further questions, I'll cede to Mr. Wright. Thank you. Three very quick points. First, there was no finding in the judge's opinion, Judge Crabb's opinion, at A191 to A192 on the subjective prong of the exceptional case, Section 285 analysis. Second, Mr. Spangenberg's testimony with respect to the 658 patent being a server-side patent was entirely accurate. It is a server-side claim, that's why the defendants were at the car companies. The issue is whether an Internet user could meet two of those steps, steps three and four of the method claim. There's nothing in the claims or the district court's claim construction, objectively, that precludes an Internet user from meeting those two steps of the method claims. And finally, the fact that Torres ended up ultimately being wrong, in Judge Crabb's view, on the infringement contentions, is not a sanctionable conduct. Thank you. We thank both counsel and the cases submitted.